**INTERNATIONAL SECURITY CORPORATION OF VIRGINIA, Appellant,**

v.

**Butterfly McQUEEN, Appellee.**

No. 84-1006.

District of Columbia Court of Appeals.

Argued June 19, 1985.

Decided Aug. 30, 1985.

John R. Metz, Washington, D.C., with whom Philip L. Cohan, Washington, D.C., was on brief, for appellant.

Robert W. Mance, Washington, D.C., with whom Leslie R. Crawford was on brief, for appellee.

Before FERREN, TERRY, and ROGERS, Associate Judges.

FERREN, Associate Judge:

In this civil action for assault and battery, the jury found for plaintiff-appellee and awarded $60,000 in compensatory damages for physical and mental suffering. Defendant-appellant contends on appeal that the trial court acted improperly when, *sua sponte*, it vacated the new trial order it had entered shortly after trial and reinstated the jury verdict. Because we conclude that the trial court did not err in reversing itself, that all the issues were properly submitted to the jury, and that the jury verdict was not excessive, we affirm.

## I.

The underlying facts are essentially uncontested. On April 7, 1979, at about 11:45 p.m., plaintiff Butterfly McQueen, who had come to the District of Columbia to receive an award from the District of Columbia Department of Recreation, was waiting in the Greyhound[1] bus station for a bus to Tampa, Florida. McQueen, then a 68-year-old woman, was in the ladies' lounge when two security guards employed by defendant, International Security Corporation of Virginia (ISCV), approached and asked to see her bus ticket, apparently thinking she was a thief.[2] McQueen refused to show the guards her ticket unless they displayed their badges and gave their names. At this point, McQueen testified, one of the guards "pushed me back into the room, ... karated me to the floor and I banged my ribs against the metal bench against the wall." McQueen elaborated: "I fell down. My left leg doubled under me, and my right leg went under. My right buttock hit the cement floor, ... and this rib hit the metal bench, banged up against the bench." The guards then detained McQueen and took her upstairs where she was questioned by the police before being released.

Other persons were present during McQueen's assault and apprehension, and she testified that she was "embarrassed" in their presence. McQueen also testified that, after the assault, she suffered from a radiating pain in her left shoulder and a swelling under her left knee.[3] She further

---

1. Greyhound was named as a defendant in the suit, but the court granted its motion for directed verdict at the end of plaintiff's case in chief.

2. McQueen testified that the guards said, "Come out here and show me your ticket. You'll clip a person in a minute." "Clipper" apparently is a slang term for a thief.

3. McQueen said of her shoulder pain: "Sometimes it fans out and goes up, and I'm afraid it will go up to my brain, or come to my spine. It hurts when I get tense." She said of her leg

testified that she had never had either kind of pain before the assault, and that thereafter it had continued "intermittently" over the "four years" between the incident and trial.

Neither side presented any medical testimony at trial. McQueen, who testified that she did not consult a doctor until two or three years after the assault,[4] explained why she did not do so earlier: "Because I'm ashamed of being ill. I don't believe in sickness.... I didn't want to go and talk about [how] I was hurt."

The trial court submitted to the jury the issues of ISCV's liability and of compensatory damages for assault and battery.[5] The jury returned a verdict in McQueen's favor and awarded her $60,000 in damages. ISCV then filed a motion for remittitur, or new trial, or judgment notwithstanding the verdict. On July 22, 1983, in a brief written order without elaborating reasons, the court denied ISCV's motion for judgment n.o.v. but granted ISCV's motion for a new trial "unless plaintiff files with the Court within fifteen (15) days of this Order a written consent to reduce the verdict to $25,000.00." Because McQueen did not agree to the remittitur, this order effectively became a new trial order.

In May 1984, however, the court *sua sponte* raised the question whether it had improperly entered the new trial order. After receiving memoranda of law from the parties, the court on July 3, 1984, vacated its new trial order and reinstated the jury verdict.

At the time the Court granted a new trial or, alternatively, a remittitur, the Court was of the view that the verdict was excessive in light of the absence of medical testimony that the injuries complained of by plaintiff were of a permanent nature. The Court erred. It appears from the authorities that a jury may reasonably infer permanence of injury without supporting expert medical testimony when the effects of such injury according to the testimony of the plaintiff have persisted for a long period of time and there is no uncontradicted medical testimony that the injury is temporary. *American Marietta, Inc. v. Griffin and McCloskey & Co.*, 203 A.2d 710 (D.C.App.1964); *see also Gray Line, Inc. v. Keaton*, 428 A.2d 360 (D.C.App. 1981); *Jones v. Miller*, 290 A.2d 587 (D.C.App.1972).

ISCV appeals from this order.

## II.

■ Appellant contends, first, that the trial court erred in vacating the July 1983 new trial order since there had been no intervening change in facts or law. We disagree. For as long as the new trial order was in effect, the court had continuing jurisdiction over the case. We know of no rule that says the court may not change its mind, in order to conform its rulings to a correct understanding of the law. *Cf. United States v. Green*, 134 U.S.App.D.C. 278, 279, 414 F.2d 1174, 1175 (1969) ("The oral ruling of a trial judge is not immutable, and is of course subject to further

pain: "[M]y leg doubled under there. Under that kneecap, there's a big egg there."

**4.** McQueen acknowledged at trial that she had not consulted a doctor about her injuries as of the time of her deposition in March 1980, eleven months after the assault. Eventually, she consulted a Doctor Freeman in New York. Dr. Freeman's medical report, although not admitted into evidence at trial, was submitted in support of defendant's motion for remittitur, new trial, or judgment notwithstanding the verdict. The report, dated March 19, 1982, indicates that McQueen first visited Dr. Freeman in June 1981 and that McQueen suffered from traumatic ar-

thritis and also myositis (*i.e.*, muscle pain) of the thoracic (chest) and gluteal (buttocks) muscles, both secondary to (*i.e.*, resulting from or consistent with) McQueen's fall.

**5.** McQueen's complaint had alleged assault, battery, false arrest, slander, and intentional infliction of emotional distress and had requested both compensatory and punitive damages. At the end of plaintiff's case, the court granted ISCV's motion for directed verdict as to punitive damages. At the end of defendant's case, ISCV renewed its motion for directed verdict and the court granted this motion except as to assault and battery.

reflection, reconsideration and change.").[6] The real question, then, is the merits of the trial court's permitting the jury verdict to stand.

### III.

■ The trial court's decision to vacate the new trial order was tantamount to a denial of ISCV's motion for new trial and, in the alternative, for judgment n.o.v. In reviewing such a decision on appeal, "this court must apply the same standard as the trial court in considering whether a jury could reasonably reach a verdict in favor of the opponent of the motion." *Vassiliades v. Garfinckel's*, 492 A.2d 580, 586 (D.C. 1985) (citations omitted). In so doing, we must view the evidence and all reasonable inferences in the light most favorable to the party who obtained the jury verdict, and we may reverse only if no juror could reasonably have reached a verdict for that party. *District of Columbia v. Cassidy*, 465 A.2d 395, 397–98 (D.C.1983) (per curiam) (citations omitted).

Appellant contends that, because McQueen failed to present any expert medical testimony, she failed to present evidence sufficient to prove either causation or permanence of injury. Thus, appellant argues, the court erred in reinstating the jury verdict in McQueen's favor.

### A.

■ In every personal injury case, the plaintiff carries the burden of proving not only that he or she was injured but also that the defendant's tortious conduct caused the injury. *See Manes v. Dowling*, 375 A.2d 221, 224 (D.C.1977).[7] In the absence of "complicated medical questions," *Jones v. Miller*, 290 A.2d 587, 590 (D.C. 1972), the plaintiff's own testimony, without need for supporting expert medical testimony, will suffice to prove causation of injury. *See id.* "No complicated medical question" arises when: (1) the injury " 'develops coincidentally with, or within a reasonable time after, the negligent act,' " or (2) " 'the causal connection is clearly apparent from the illness [or injury] itself and the circumstances surrounding it,' " or (3) " 'the cause of the injury relates to matters of common experience, knowledge, or observation of laymen.' " *Id.* at 590–91 (quoting *Wilhelm v. State Traffic Safety Commission*, 230 Md. 91, 92, 185 A.2d 715, 719 (1962); *accord Early v. Wagner*, 391 A.2d 252, 254 (D.C.1978).

■ In this case, the second *Jones* rationale applies. McQueen suffered from a radiating pain in the left shoulder and a swelling under the left knee—injuries which, by their very nature, reflect the causes evidenced by McQueen's sworn testimony: "a karate thrust (demonstrating)[8] like that, and the person goes down," followed by a doubling of the left leg (plus the banging of a rib against a metal bench and the striking of the right buttock against a cement floor). Thereafter, McQueen suffered intermittent pain in her shoulder and

---

6. We note that, in reversing its new trial order, the court did not amend its findings of fact. The trial court does not have authority to reverse a finding of fact that was formally announced and duly entered. *See Washington Gas Light Co. v. George A. Fuller Co.*, 257 A.2d 498, 499 (D.C.1969); *Roumel v. Stradley*, 119 A.2d 111, 112–13 (D.C.1955).

7. The trial court's July 3, 1984, order reinstating the verdict was addressed solely to McQueen's burden of proof on permanence of injury. McQueen also, of course, had the burden of proving causation. Accordingly, we must review the sufficiency of the evidence for that purpose as well.

8. Although the transcript does not show conclusively that the "karate thrust" was to McQueen's shoulder, we believe that the inference of a blow to the shoulder area is proper, for two reasons: (1) A karate blow with the hand, knocking someone down, most likely is administered to the upper part of the body (no karate blow by the foot is indicated here); (2) the experienced trial court, which observed McQueen's demonstrative testimony, was aware of *Jones* (which he cited) and concerned only about whether, absent expert medical testimony, there was enough evidence to show permanence of injury, not causation. Accordingly, we should construe any ambiguity in the transcript in appellee's favor, not against her.

knee, *see supra* note 3, which she never had suffered before. In accordance with *Jones*, therefore, a jury properly could find that the assault caused McQueen's injuries, without need for medical testimony.[9]

### B.

■ Once the issue of causation was properly before the jury, McQueen's testimony also sufficed for the jury to consider the permanence of her injuries as well. "[W]hen the bad effects of an injury have continued for years, laymen may reasonably infer permanence," even in the absence of expert medical testimony, if there is no contrary testimony that the injuries are temporary. *American Marietta Co. v. Griffin*, 203 A.2d 710, 712 (D.C.1964); *see Davis v. Abbuhl*, 461 A.2d 473, 476 n. 5 (D.C.1983). McQueen testified that, after the pain began, she felt it "intermittently" and continually to the time of trial, four years after the assault. No evidence to the contrary was offered. On the basis of McQueen's testimony, therefore, the jury could infer permanence.

### IV.

■ Appellant also contends that the trial court improperly reinstated the jury verdict because the verdict was excessive. The trial court, in determining whether a verdict is excessive, "must consider whether the verdict resulted from passion, prejudice, mistake, oversight, or consideration of improper elements." *Vassiliddes*, 492 A.2d at 594 (citations omitted). It should allow that verdict to stand unless it is " 'beyond all reason' " or " 'so great as to shock the conscience.' " *Id.* (citations omitted). Here, the trial court stated in its July 3, 1984 order: "based upon the uncontroverted proof of damages respecting her injuries adduced by plaintiff, the Court is of the view that the jury award was generous but 'not generous to a fault or outside the bounds of legal appropriateness.' "

■ This court must accord great deference to the trial court's decision to grant or deny a motion for new trial based on excessiveness of the verdict and may reverse that decision only for an abuse of discretion. *Id.; Davis*, 461 A.2d at 475 (citations omitted); *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 864 (D.C.1982) (citations omitted).[10] We perceive no such abuse here.

■ In arriving at its award of compensatory damages, the jury could properly consider the physical pain of the assault

9. Arguably, the first *Jones* exception—injury developing "concidentally with, or within a reasonable time after, the negligent act"—applies as well. When McQueen's counsel attempted to pin down the exact time that physical suffering commenced, she answered: "Well, do you mean pain? Do you mean pain? I was frustrated and then angry, but the pain comes after...." She added that "I don't know when the pain came, but I do now that—." Defense counsel successfully objected at that point, obviously attempting to limit the record to an unfinished answer implying that the pain was not immediate. On the basis of the testimony taken as a whole, however, there may be a fair inference that McQueen felt the pain soon after the shock from the assault, which initially produced frustration and anger. Based on her testimony elsewhere in the record, where she exhibited impatience at being pinned down to the exact time of the confrontation in the lounge—"I don't have any conception of time"—there may be a fair inference that she interpreted the question about the time the pain first arose—to which

she gave an incomplete answer—to call for absolute precision, which she could not give; she should not necessarily be understood to have meant that the pain did not come for a long time after the assault.

10. Where appeal is taken from the denial, rather than the granting, of a new trial motion on the ground of excessive verdict, two factors—deference to the trial court *and* deference to the jury—point to "very restricted review" of the decision. *Taylor v. Washington Terminal Co.*, 133 U.S.App.D.C. 110, 113, 409 F.2d 145, 148, *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969).

> Where the jury finds a particular quantum of damages and the trial judge refuses to disturb its finding on the motion for a new trial, the two factors press in the same direction, and an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial.

*Id. See also Haycock v. Christie*, 101 U.S.App. D.C. 409, 410, 249 F.2d 501, 502 (1957).

itself and any lasting physical injuries that McQueen may have suffered. The jury also could properly consider the embarrassment and humiliation that McQueen suffered at the time of the assault. *See Woodard v. City Stores Co.*, 334 A.2d 189, 191 n. 2 (D.C.1975); *Neisner Bros., Inc. v. Ramos*, 326 A.2d 239, 240 (D.C.1974); *Axman v. Washington Gaslight Co.*, 38 App. D.C. 150, 160 (1912); *Zell v. Dunaway*, 115 Md. 1, 3, 80 A. 215, 216 (1911); PROSSER AND KEETON ON THE LAW OF TORTS § 9, at 40 (5th ed. 1984) (proof of liability for assault and battery entitles plaintiff to "compensation for the resulting mental disturbance, such as fright ... or humiliation") (footnote omitted); 6A C.J.S. *Assault and Battery* § 56.a (1975).

 Under the circumstances, the jury's award of $60,000 was not so great as to " 'shock the conscience.' " *See Vassiliades*, 492 A.2d at 594 (and cases cited). Accordingly, the trial court did not abuse its discretion in vacating the new trial order and reinstating that verdict.[11]

*Affirmed.*

---

**11.** We also reject appellant's claim that the jury verdict was an improper award of punitive damages. The jury was instructed only as to compensatory damages. *See supra* note 5. The *ad damnum* clause in appellant's complaint claimed $50,000 in compensatory damages; the jury awarded $60,000. Appellant does not contend that it is improper for a trial court, in its discretion, to permit an award of compensatory damages in excess of the amount claimed in the complaint. *See Miller v. District of Columbia*, 479 A.2d 329 (1984). There is nothing in the record to indicate that the jury awarded other than compensatory damages, as instructed.