J. Leon WILLIAMS, Appellant,

v.

Berteen M. PATTERSON, Appellee.

No. 95–CV–301.

District of Columbia Court of Appeals.

Argued June 4, 1996.
Decided Aug. 22, 1996.

Gwendolyn D. Prioleau, Silver Springs, MD, for appellant.

Gary C. Christian, Washington, DC, with whom Kenneth Shepard, Sacramento, CA, was on the brief, for appellee.

Before FERREN, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

In this suit for legal malpractice, a jury awarded Patterson $40,000 after finding that Williams, an attorney she had retained, negligently failed to take action within the three-year statute of limitations to preserve claims by Patterson arising from a 1985 automobile accident in which her car was struck in the rear by another vehicle. The jury found that the owner of the vehicle causing the accident was uninsured, thus enabling Patterson to sue for personal injury under the District of Columbia No–Fault statute in effect at the time of the accident, D.C.Code § 35–2105(b)(5) (1985 Supp.); and that Williams had negligently failed either to file suit against the driver or to file a claim with Patterson's own insurance company for uninsured motorist coverage before the statute of limitations expired. We reverse, because Patterson presented no expert medical testimony linking the injuries for which she claimed damages to the automobile accident, and in this case that defeated her proof of causation as a matter of law.

## I.

On July 30, 1985, Patterson's car was struck in the rear by another car while she was waiting at a stop sign in Southeast Washington, D.C. Within a week of the accident, she hired appellant Williams to represent her in a claim for injuries. The jury heard evidence that Williams, before the relevant statute of limitations had expired, did not file suit against the other driver or file a claim with Patterson's insurance company despite learning early on that the owner of the other car was uninsured, thus permitting suit (and, by extension, recovery of uninsured

motorist benefits) under the District of Columbia No–Fault Act of 1982.[1] Patterson released Williams as her attorney in 1989, and brought suit against him a year later.

At trial Patterson testified that she had suffered back injuries and whiplash in the collision. She sought treatment initially from a Dr. Rones and a neurological surgeon, Dr. Sydney I. Green. She continued her medical care for several years and eventually had an operation for a herniated disc. The written summary of Dr. Green's neurological consultation, which took place two weeks after the accident, revealed that Ms. Patterson had had medical problems, including back trouble, dating from well before the July 1985 accident:

> The patient has an extensive history. She worked as a cook until she retired on social security disability in 1981 and this was because of back trouble. This was diagnosed as arthritis, though she has some mild knee complaints also, and she has never been able to return to her work. She attends a clinic in her home in North Carolina and they give her Feldine and Paraflex on an ongoing basis. She went to HUH in June of 1985 because of her back complaint and she was x-rayed there and given Tylenol # 3 pills and this is what she has been taking since this present accident. She also takes blood pressure pills, Catapres, 1.5 mgms, bid. In addition, she was eight days in HUH in July because of a blood clot condition and she has had three prior hospitalizations for this blood clot condition and has remained on chronic Coumadin medication, 12 mgms, daily, with blood levels checked every two weeks. In these blood clot formations she does not seem to have much swelling of the right leg. No complications from the therapy. In spite of all these troubles she has been quite active, driving not infrequently to the Washington area from Raleigh, North Carolina as she has a daughter and friends here.

---

1. That provision of the No–Fault Act has since been deleted. See D.C.Code § 35–2105 (1993 repl.).

Dr. Green also reported that two days before he examined Ms. Patterson she had fallen backwards into an open shopping cart, resulting in "a three inch by three inch bruising" and slight tenderness, but no loss of muscle function. Dr. Green's diagnosis was of "[a] back strain as of 7–30–85 [the accident date] exacerbating a prior condition," and "[t]emporarily compounded now by this other fall." He said that Ms. Patterson "[s]hould continue with rest and to be careful not to have falls."

In January 1986, Patterson consulted with Dr. Michael E. Batipps, a neurosurgeon. His written report also stated that she "has a long history of low back pain since her early teenage years" (she was then 49 years old) and that "[o]ver recent years, the pain has gradually increased in severity." Dr. Batipps noted that "[o]ne to two years ago" Patterson had been "admitted to D.C. General Hospital for traction," and was subsequently treated at a Rheumatology Clinic there and "told that she had 'arthritis' of the lower back." He further described her self-report that since the July 1985 automobile accident she felt "that her back pain has been much worse and sharper,"[2] and she "had radiation of the pain to the left lower extremity for the first time." Following a neurological examination, Dr. Batipps stated his "Impression" as:

1. Chronic low back pain due to degenerative joint disease, aggravated by trauma.

2. Lumbosacral strain with possible left lumbosacral radiculopathy.

3. Cervical strain with possible right cervical radiculopathy.

While noting in his "Comment" that Ms. Patterson "has had a long history of low back pain," Dr. Batipps stated that, "In reviewing this history carefully with her, the pain has been significantly affected by her automobile accident...." He recommended that she be evaluated "for herniated disc and nerve root compression." Several weeks later Dr. Batipps wrote that Patterson "continues to have chronic low back pain." It was his "feeling

that this patient had underlying previously asymptomatic degenerative joint disease which became symptomatic following her injury." In addition, there appeared "to be a herniated disk [sic] at L5–S1," and he believed "that her symptoms are related to post traumatic lumbosacral strain and the associated herniated disk [sic]."

In yet another misadventure, Ms. Patterson fell and broke her leg in early 1987 and was treated by Dr. Willie E. Thompson, an orthopedic specialist. During this treatment, Dr. Thompson determined that she "had lumbar disc disease" and "was also suffering from spondylolisthesis." As a result, in September 1987 Patterson underwent (in the words of Dr. Thompson's later report) "a decompressive laminectomy and a bilateral posterior lateral spinal fusion." Dr. Thompson was still treating Ms. Patterson in June of 1988 when, in a report, he summarized her condition partly as follows:

Ms. Patterson gave a history of being involved in an automobile accident on July 30, 1985. She indicates that she had no problems with any significant back pain, prior to that injury. It is difficult to say if this is exactly the cause of her injury, but it certainly is possible. If she had no pain prior to such time as she had the accident, and this was followed by pain and discomfort, then it may be causatively related.

At trial appellant Williams moved for a directed verdict and later judgment notwithstanding the verdict in part on the ground that Patterson had failed to present expert medical testimony on the issue of causation. The trial judge denied the motions and, in instructing the jury on damages with respect to the permanency of Patterson's injuries, stated:

[I]n this case the plaintiff has offered some evidence that as a result of the auto accident, the plaintiff suffered personal injury with residual effects which persist at the present time. Although no physician or expert was called to give an opinion of the expected duration of the injury, from the

---

2. Dr. Batipps noted that following the accident Patterson had been taken to the Capitol Hill Hospital where x-rays were "said to be negative except for arthritis," and that since November of

1985 she had been receiving treatment from a Dr. Theodore Watkins, who had referred her to Dr. Batipps.

facts and circumstances of the case and from the nature and duration of the injury, you may, if you believe the evidence, infer that the plaintiff has suffered a permanent injury.

## II.

In this legal malpractice suit, Patterson could recover damages only if she proved, among other things, that the injuries she suffered (and for which her attorney assertedly neglected to take action) stemmed in part from the automobile accident. Williams makes several challenges to the jury verdict, but the issue on which we decide the case is whether Patterson's failure to present expert medical testimony on causation was fatal to her proof. We conclude that on the evidence presented it was.

 There is no inflexible requirement in a personal injury case that the plaintiff produce expert medical testimony on causation. "In the absence of 'complicated medical questions,' the plaintiff's own testimony, without need for supporting expert medical testimony, will suffice to prove causation of injury." *International Sec. Corp. of Va. v. McQueen,* 497 A.2d 1076, 1080 (D.C.1985) (citation omitted). We explained in *McQueen:*

> No complicated medical question arises when: (1) the injury develops coincidentally with, or within a reasonable time after, the negligent act, or (2) the causal connection is clearly apparent from the illness [or injury] itself and the circumstances surrounding it, or (3) the cause of the injury relates to matters of common experience, knowledge, or observation of laymen.

*Id.* (citations and internal quotation marks omitted). *See also Baltimore v. B.F. Goodrich Co.,* 545 A.2d 1228, 1231 (D.C.1988). But the converse is equally true: "[I]n cases presenting medically complicated questions due to multiple and/or preexisting causes, or questions as to the permanence of an injury, we have held that expert testimony is required on the issue of causation." *Id.* (citations omitted); *see also Gray Line, Inc. v. Keaton,* 428 A.2d 360, 362 (D.C.1981) (citation omitted).

 Patterson, of course, sought recovery for permanent injury (see the quoted jury instruction), but, more fundamentally, the evidence summarized above demonstrates an obvious "complication" in the causation issue presented in this case. Nearly all of the medical reports introduced in evidence described her injuries from the accident as having "exacerbat[ed]" or "aggravated" a preexisting back condition. "The law is settled that where an accident does not cause a diseased condition, but only aggravates and increases the severity of a condition existing at the time of the accident, such party could only recover for such increased or augmented sufferings as were the natural and proximate result of the negligent act." *Baltimore & Ohio Railroad Co. v. Morgan,* 35 App.D.C. 195, 200 (1910). *See Borger v. Conner,* 210 A.2d 546, 548 (D.C.1965) (case properly submitted to jury on expert medical testimony that preexisting "quiescent" condition was "very much aggravated by, and very much worsened by, the accident"). Aggravation, in other words, requires a jury to differentiate between a present medical condition and a preexisting one in evaluating the causal role of an intervening accident; only "increased or augmented sufferings" proximately resulting from the accident are compensable in court. The need for expert medical guidance in this evaluation becomes evident if we consider the following description of the analytic process:

> Resolution of the proximate cause issue depends on an analysis of each of the elements which make up proximate cause in the aggravation setting. These elements can be expressed as a series of subsidiary issues:
>
> (1) What was the plaintiff's actual physical or mental condition at the time of injury?
>
> (2) What was the plaintiff's actual physical or mental condition in the pertinent period following the accident?
>
> (3) To what extent, if any, would the pre-existing condition have worsened or otherwise become more symptomatic in the absence of trauma?

(4) What was the nature of the impact of the alleged tortious act on the plaintiff's pre-existing status?

(5) Can the plaintiff's condition at the time of trial be attributed wholly or partially to the incident which allegedly aggravated the pre-existing condition?

The answer to issue (5) must be "yes" to permit liability to be imposed against the alleged tortfeasor for aggravation injuries, and the answer to that determinative issue rests on the analysis required to supply the answers to issues (1)-(4).

M. Minzer, *et al.*, *Damages in Tort Actions*, Vol. 2 § 15.32[4], at 15–71 to 15–72 (footnote omitted).[3] As these authors explain, the issue is even more complex when the accident is asserted to have caused permanent injuries:

> Such permanency in the aggravation setting, especially where the natural progression of the preexisting condition must be taken into account, will ordinarily not be obvious, thus requiring the testimony of medical witnesses to establish both the fact of a permanent aggravation and causation attributable to the defendant.

*Id.* § 15.33[1], at 15–80.

Here, the treating physicians were uniform in recognizing Ms. Patterson's long previous history of back problems and in stating (Drs. Green and Batipps) that the accident exacerbated or aggravated her preexisting medical condition. Moreover, the jury was called upon to consider evidence not just of a preexisting condition, but of the subsequent falls Patterson suffered (one resulting in a broken leg) before the herniated disc operation became necessary more than two years after the accident. In our judgment, the absence of expert medical testimony able to put all of this in perspective and still render an opinion favoring proximate causation "left [the jury] to speculate about a matter which frequently troubles even orthopedic specialists." *Gillikin v. Burbage*, 263 N.C. 317, 139 S.E.2d 753, 760 (1965). *See also Rehnke v. Jammes*, 283 Minn. 431, 168 N.W.2d 494, 497 (1969) ("It is within the peculiar expertise of the medical

profession to assess the permanent damage [to the spine] which has been caused by each of successive accidents").

■ Patterson contends that the jury had the opinion of experts before it, in so many words, in the form of the medical reports prepared during her consultations, for example, in Dr. Batipps' conclusion that she "had underlying previously *asymptomatic* degenerative joint disease which became symptomatic following her injury" (emphasis added). But beyond the fact that none of these experts testified as a witness subject to cross-examination, none stated a conclusion within the legal and verbal framework of proximate causation. *See Carmichael v. Carmichael*, 597 A.2d 1326, 1330 (D.C.1991) (noting this court's "subtly different formulations for what is required of an expert opinion on causation," and that the expert "need not say the magical phrase of 'reasonable medical certainty,'" but holding that "the content of the testimony must make it clear that the expert is doing more than merely speculating about causation"). The closest thing to a formal opinion in the written reports, Dr. Thompson's response to Patterson's assertion that she had had no significant back pain before the accident, is just the sort of "speculating about causation" that does not suffice:

> It is difficult to say if this [the accident] is exactly the cause of her injury, but *it certainly is possible*. If she had no pain prior to such time as she had the accident, and this was followed by pain and discomfort, then *it may be* causatively related. [Emphasis added].

We therefore reverse the judgment in favor of Patterson and remand with directions to enter a judgment for the defendant.

*So ordered.*

---

3. We are not called upon to decide, of course, and do not, whether a jury must be instructed on aggravation in this detailed and schematic a fashion.